883 F.2d 76
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Charlotte TURNER, Plaintiff-Appellant,
v.
Louis SULLIVAN, Secretary, of Health and Human Services,
Defendant-Appellee.
 No. 88-4006.
 United States Court of Appeals, Sixth Circuit.
 Aug. 15, 1989.
 
 Before WELLFORD, and DAVID A. NELSON, Circuit Judges, and ANNA DIGGS TAYLOR, District Judge.*
 PER CURIAM.
 
 
 1
 This is an appeal from a district court judgment upholding a denial of disability benefits under the Social Security Act, 42 U.S.C. Secs. 301 et seq. The claimant allegedly suffers from a postural imbalance due to a fracture of the right femur, osteoarthritis, scoliosis with a sacral base tilt, and carpal tunnel syndrome. For the reasons set forth below, we shall affirm the denial of benefits.
 
 
 2
 * Claimant Charlotte Turner, a resident of Fairborn, Ohio, was born on September 8, 1948. She has a ninth grade education and has never held a steady paying job. In 1964, she suffered a fracture of her right femur in an automobile accident. The injury left her right leg slightly shorter than her left; this caused a sacral base tilt in her back, and possibly some scoliosis of the spine. In 1977, she began experiencing pain in her thoracic region and the extremities of her right side.
 
 
 3
 Since 1977, Ms. Turner has been treated by Dr. Roger Blake, a general practitioner. There are three teledictation reports from Dr. Blake in the administrative record. In the first, from October of 1984, Dr. Blake states,
 
 
 4
 "It has been reported that this patient has been disabled since 1982 due to pain over her right side.
 
 
 5
 The patient has a history of a right greater trochanter fracture. Subsequent to this fracture, the patient has had right leg shorter, a sacral base tilt and a scoliosis resulting from this problem. Patient has pain in the lumbar spine as well as over the right hip and also into the right leg. The gait is antalgic."
 
 
 6
 His diagnosis was "a Chronic Lumbar Strain secondary to Scoliosis due to an Old Right Hip Fracture. In addition, she has Degenerative Joint Disease consisting of Facet Arthritis."
 
 
 7
 In the second report, from December of 1985, Dr. Blake wrote that "[l]imitations of motion revealed lumbar spine flexion to 85 degrees. There is some questionable positive Trendelenberg on the right, indicating weakness of the gluteal." He noted that he could find no evidence of muscle atrophy or radiculopathy, and that the patient's ability to walk on heels and toes and her ability to grasp and manipulate with either hand were normal. He noted further that her range of motion of the cervical spine was full. He also noted, however, a finding of "sensory change in the median nerve of the right hand." His diagnosis was,
 
 
 8
 "Old Fracture of the right Femur involving the Greater Trochanter. 2. Degenerative Joint Disease of the Lumbar Spine. 3. Facet Arthritis of L4-5 and L5-S1. 4. Possible Carpal Tunnel Syndrome on the Right."
 
 
 9
 In his third report, from April of 1986, Dr. Blake noted that "[t]here have been no substantial changes" since the previous report. Dr. Blake stated that he had obtained consultations for the patient with Dr. Evan Young, an orthopedic specialist, who concluded, according to Dr. Blake, that she suffered from "Possible Posture Imbalance involving the right upper and lower extremity symptoms." Dr. Blake reported also that he had obtained a consultation from Dr. Frederick Smith, a physiatrist who concluded that the patient had "Chronic Musculoskeletal Pain, probably due to Postural Changes secondary to Shortening of the Right Femur and Possible Carpal Tunnel Syndrome on the Right."
 
 
 10
 In August of 1986, finally, Dr. Blake filled out a "physical capacities evaluation" for Ms. Turner in which he indicated that she could only stand or sit for less than half an hour out of an eight hour day, and could not bend, squat or lift as little as 10 lbs. He also indicated that she did not have the residual functional capacity to do sedentary or light work.
 
 
 11
 Dr. Young's report indicates that he had difficulty pinpointing the source of Ms. Turner's claimed symptoms. He diagnosed a "Possible posture imbalance with multiple right upper and lower extremity symptoms." Under "Recommendations," Dr. Young, who is a trained specialist in orthopedic surgery, wrote,
 
 
 12
 "The patient was advised that I have extreme difficulty in being able to offer good advice in this case. I am not certain what is causing all the patient's symptoms. It would be my feeling however if the leg length discrepancy is as described, gradual lift therapy should be useful."
 
 
 13
 Dr. Young noted that Ms. Turner's range of motion in the lumbar spine was restricted to 85 degree flexion, but there was no significant restriction of lateral flexion or extension.
 
 
 14
 Dr. Smith, a physiatrist, wrote in his report that Ms. Turner's range of motion of the upper and lower extremities, neck and back were within normal limits. He could find no sensory loss "except within the median nerve distribution of the right hand." His diagnosis was "chronic musculoskeletal pain probably due to postural changes secondary to shortening of the right femur. Possible carpal tunnel syndrome on the right." He also noted that there may have been some "psychological overlay" to her claimed symptoms. He recommended that she start wearing a lift, and that she begin treatment of her right shoulder.
 
 
 15
 In May of 1984, Ms. Turner was referred by Dr. Blake to Dr. Aivars Vitols, an orthopedic surgeon. Dr. Vitols diagnosed "lumbar strain/sprain" and recommended "hot packs, ultrasound, massage and TNS evaluation." At Dr. Vitols' request, Ms. Turner underwent an EMG. The impression of Dr. Mark MacNealy, the neurologist who administered the EMG, was that Ms. Turner had chronic L5 radiculopathy on the right side, but showed no evidence of active denervation, and no evidence of peripheral neuropathy.
 
 
 16
 At the request of the Secretary of HHS, Ms. Turner was examined on December 15, 1984 by Dr. William Miely, an orthopedic surgeon. His examination of her spine did not reveal any clinical scoliosis, although he noted a slight elevation of her left pelvis. Dr. Miely did not see any signs of muscle weakness or atrophy, and he found the disc spaces to be well maintained. His concluding impression was that she suffered from paraspinal muscle spasm and lumbosacral strain, secondary to a discrepancy in leg length, but that no objective findings of radiculopathy could be made.
 
 
 17
 Ms. Turner first applied for benefits on September 18, 1984, alleging that she had been unable to work since 1982 due to a musculoskeletal impairment. This claim was denied by the Social Security Administration upon initial review on December 27, 1984. Ms. Turner filed a second application for benefits on November 21, 1985; this application too was denied initially and upon reconsideration. She then requested an administrative hearing before an Administrative Law Judge. The hearing was held on August 27, 1986.
 
 
 18
 At the hearing, Ms. Turner testified that she was only comfortable when lying down. She stated that she could not work in a job where she would have to sit all day, because she couldn't sit that long. According to her testimony, she had never been hospitalized for her condition, and she had tried wearing a lift a few years before, as several doctors had recommended, but it only made her condition worse. She stated that she could walk for about half an hour to an hour, could sit for maybe half an hour, and could lift ten to fifteen pounds. She admitted that she did the cooking, cleaning and washing for herself and her teenaged son.
 
 
 19
 A vocational expert, Mr. Leon Segal, also testified. When asked to assume that Ms. Turner had the residual functional capacity to do light work activity, allowing for alternating sitting and standing, Mr. Segal stated that the local economy had 11,000 positions, such as parking lot attendant and personal companion, that met these requirements. He stated that if he were to assume Ms. Turner retained only the residual capacity to do sedentary work, there were 3,100 jobs in the local economy which would meet her requirements.
 
 
 20
 The ALJ applied the following familiar principles:
 
 
 21
 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 CFR 404.1520(b));
 
 
 22
 2. If an individual is not working and is suffering from an impairment which meets the duration requirement and which "meets or equals a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of 'disabled' " will be made without consideration of vocational factors (20 CFR 404.1520(d));
 
 
 23
 3. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 CFR 404.1520(e));
 
 
 24
 4. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 CFR 404.1520(f)).
 
 
 25
 The rules set out in Appendix 2 of Subpart P of Social Security Regulations No. 4 are considered in determining whether a claimant with exertional impairments is or is not disabled. The regulations also provide that if an individual suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining residual functional capacity. (20 CFR 404.1545.) If a finding of disability cannot be made based on strength limitations alone, the rules established in Appendix 2 are used as a framework. In cases where the individual has only a nonexertional impairment, a determination as to whether disability exists is to be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in Appendix 2.
 
 
 26
 The ALJ's decision, dated October 21, 1986, found plaintiff not disabled. The ALJ determined first that although Ms. Turner suffered from a postural imbalance, possible carpal tunnel syndrome, and chronic lumbosacral strain, these conditions did not constitute an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ also found, in light of the several medical findings, that she retained a normal range of motion and normal strength in her upper extremities, that she had the residual functional capacity to perform sedentary work, at least, and possibly light work. He concluded, based on Mr. Segal's testimony, that the local economy had a significant number of jobs that would accommodate Ms. Turner's restrictions. The Appeals Council denied Ms. Turner's request for review of the ALJ's decision.
 
 
 27
 Ms. Turner then appealed to the district court. The matter was referred to a magistrate, who noted that Dr. Blake's physical capacities evaluation was contradicted not only by the other medical evidence in the record, but also by Dr. Blake's written reports and even by Ms. Turner's own testimony. The magistrate therefore recommended that the decision of the Secretary be affirmed. The district court agreed.
 
 II.
 
 28
 The claimant argues that the Secretary failed to give proper weight to the reports and findings of Dr. Blake, who first treated her in 1977 and who continued to act as her treating physician throughout the period involved in her claim for benefits. It is true that the medical opinions of treating physicians "are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference." Harris v. Heckler, 756 F.2d 431, 435 (6th Cir.1985). Such deference is due, however, "only if the treating physician's opinion is based on sufficient medical data." Houston v. Secretary of HHS, 736 F.2d 365, 367 (6th Cir.1984). "Ultimately, the determination of disability is the prerogative of the Secretary, not the treating physician...." Id.
 
 
 29
 Dr. Blake's physical capacities evaluation, which claimed that Ms. Turner did not retain the residual functional capacity for even sedentary work, was contradicted by the findings of other physicians, and may be inconsistent with Dr. Blake's own teledictation reports. For example, Dr. Blake indicated on the physical disabilities evaluation form that Ms. Turner could not squat at all; he noted in an earlier report, however, that Ms. Turner's ability to arise from a squat was "normal." Likewise, although he indicated on the physical disabilities evaluation that she could not bend at all, he earlier noted that the range of motion of her cervical spine was full and her lumbosacral flexion was only decreased to 85 degrees.
 
 
 30
 Further, as the magistrate noted, the supposed limitations on Ms. Turner's ability to function are contradicted by her own testimony. The claimant stated that she could lift 10 to 15 lbs. Dr. Blake wrote that she could not lift 10 lbs. She stated that she could walk from a half an hour to an hour; Dr. Blake indicated that she could not stand or walk for half an hour. Ms. Turner testified that she did the cooking, cleaning and dishwashing for her son and herself, and that she sometimes drove a car. This is surely inconsistent with Dr. Blake's assertions that she could not bend, squat, or use her feet to operate foot controls. In short, the ALJ could reasonably have interpreted Ms. Turner's testimony as rendering the physical capacities evaluation somewhat less than credible.
 
 
 31
 Counsel for Ms. Turner contended at oral argument that the differences between Dr. Blake's physical capacities evaluation, on the one hand, and his earlier reports and Ms. Turner's own testimony, on the other hand, were only minor discrepancies. If that be true, however, Dr. Blake's conclusion of disability is at odds with the other medical evidence in the case, which could reasonably have been construed as supporting a finding that she was not disabled. Dr. Young found that Ms. Turner exhibited a full range of motion of the right shoulder and no significant atrophy of the right shoulder muscle. "She exhibits no significant restriction of lateral flexion or extension," he wrote. Her physical examination was apparently so normal that Dr. Young professed to be mystified as to what could be causing her alleged symptoms. Dr. Smith, the physiatrist, found that the range of motion of the upper and lower extremities, neck and back was normal. Dr. Miely found no evidence of muscle weakness, no signs of atrophy, and a fully normal range of motion in the upper and lower extremities, as well as a normal ability to grasp and manipulate with both hands.
 
 
 32
 Claimant suggests that Dr. Miely's opinion should be discredited because he failed to find any clinical evidence of scoliosis, yet an X-ray study showed "a moderate rotoscoliosis of the lumbar spine to the right." However, the same X-ray report noted that the lumbar segments showed no evidence of pathology and that the sacroiliac and hip joints appeared normal. And another, later X-ray did not mention any scoliosis as present, though it did mention "minimal sclerotic changes with oblique facets of the lower lumbar spine at the L4-L5 L5-S1 level." The ALJ could reasonably have concluded, we believe, that this minimal sclerosis did not eliminate her residual functional capacity to perform sedentary or light work.
 
 
 33
 Ms. Turner also argues that her subjective complaints of pain were not properly considered, and that if they had been, a finding of disability would have been directed. This circuit has a two-pronged test for evaluating complaints of disabling pain:
 
 
 34
 "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."
 
 
 35
 Duncan v. Secretary of HHS, 801 F.2d 847, 853 (6th Cir.1986). Here, the ALJ concluded that although objective medical evidence existed that the claimant had an underlying medical condition, her condition did not support a finding of pain of the severity which she alleged. This conclusion, we find, was supported by substantial evidence. The doctor who administered the EMG found no evidence of denervation or peripheral neuropathy. The most recent x-ray showed only "minimal sclerotic changes" in the lower lumbar spine, and described the intervertebral disc spaces as "normal." Both Dr. Smith and Dr. Young, specialists to whom Ms. Turner was referred by Dr. Blake, found the objective evidence not consistent with the subjective complaints.
 
 
 36
 The range of activities in which Ms. Turner engages also provides support for the ALJ's conclusion that she was not disabled. See Bradley v. Secretary of HHS, 862 F.2d 1224, 1227 (6th Cir.1988) ("The evidence in this case indicated that Bradley was not inconvenienced by his pain and was able to perform a variety of activities. Accordingly, the Secretary did not err in concluding that Bradley's complaints of pain were not credible.")
 
 
 37
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, sitting by designation